UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| REYNALDA MOLINA, individually; JACQUELINE MENDEZ-MADUEÑA, individually; G.M., a minor; and N.A.C., a minor, and each of them, by and through their Guardian Ad Litem VERONICA AYON,<br><br>Plaintiff,<br><br>v.<br><br>CITY OF VISALIA, a municipal corporation; ADAM COLLINS; DANIEL ROBERTS; DIRK ALFANO, individually and in their official capacity; and DOES 4 through 100, inclusive,<br><br>Defendants. | No. 1:13-cv-01991-DAD-SAB<br><br>ORDER DENYING MOTION FOR PARTIAL SUMMARY JUDGMENT<br><br>(Doc. No. 90) |

On June 20, 2014, plaintiffs Reynalda Molina and Jacqueline Mendez-Madueña with minors G.M. and N.A.C. through *guardian ad litem* Veronica Ayon filed the currently operative second amended complaint ("SAC") against the City of Visalia, Officer Adam Collins, Officer Daniel Roberts, Officer Dirk Alfano, and DOES four through one hundred.  (Doc. No. 40.)  The action stems from a high speed chase involving the police, during which shots were fired that resulted in deaths of Ruben Molina and Edwardo Madueño.  The SAC alleges causes of action for:  (1) unreasonable search and seizure and use of excessive force under 42 U.S.C. § 1983; (2)

1

substantive due process under 42 U.S.C. § 1983; (3) wrongful death under California Government Code §§ 815.2(a), 820(a) and California Civil Code § 43; (4) negligence survival action; (5) negligence under California Government Code § 815.2(a); and (6) assault and battery under California Government Code § 815.2(a). (*Id.*)

On March 21, 2016, defendants filed a partial motion for summary judgment pursuant to Federal Rules of Civil Procedure 56 seeking judgment in their favor as to: (1) any § 1983 claims relating to the high speed chase itself; (2) all claims against defendant Officer Alfano; and (3) all claims brought on behalf of plaintiff N.A.C. (Doc. No. 90.) Plaintiffs filed an opposition to defendants' motion for partial summary judgment in which plaintiffs sought a modification of the scheduling order to allow them to conduct additional discovery in order to oppose defendants' motion for summary judgment. (Doc. Nos. 92 and 93.) Defendants filed a reply. (Doc. No. 94.) On April 19, 2016, the court heard oral arguments.

At that hearing, plaintiffs' counsel represented that they had obtained additional evidence that Madueña held N.A.C. out as his child, but that this evidence was not before the court. Accordingly, the court provided plaintiffs' counsel ten days to submit a declaration with additional evidence with respect to this issue. (Doc. No. 96.) On April 29, 2016, plaintiffs submitted the declaration of Veronica Ayon and briefing arguing that the hearsay rule did not apply to the contents of Ayon's declaration. (Doc. No. 97.) On May 6, 2016, defendants filed a reply. (Doc. No. 98.) The motion was then taken under submission.

For the reasons explained below, defendants' motion for partial summary judgment will be denied.

**SUMMARY JUDGMENT STANDARDS**

Summary judgment is appropriate when the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).

Under summary judgment practice, the moving party "initially bears the burden of proving the absence of a genuine issue of material fact." *In re Oracle Corp. Securities Litigation*, 627 F.3d 376, 387 (9th Cir. 2010) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).

1  The moving party may accomplish this by "citing to particular parts of materials in the record,
2  including depositions, documents, electronically store information, affidavits or declarations,
3  stipulations (including those made for purposes of the motion only), admission, interrogatory
4  answers, or other materials" or by showing that such materials "do not establish the absence or
5  presence of a genuine dispute, or that the adverse party cannot produce admissible evidence to
6  support the fact." FED. R. CIV. P. 56(c)(1)(A), (B).

7  When the non-moving party bears the burden of proof at trial, "the moving party need
8  only prove that there is an absence of evidence to support the nonmoving party's case." *Oracle*
9  *Corp.*, 627 F.3d at 387 (citing *Celotex*, 477 U.S. at 325.). *See also* FED. R. CIV. P. 56(c)(1)(B).
10 Indeed, summary judgment should be entered, after adequate time for discovery and upon motion,
11 against a party who fails to make a showing sufficient to establish the existence of an element
12 essential to that party's case, and on which that party will bear the burden of proof at trial. *See*
13 *Celotex*, 477 U.S. at 322. "[A] complete failure of proof concerning an essential element of the
14 nonmoving party's case necessarily renders all other facts immaterial." *Id*. In such a
15 circumstance, summary judgment should be granted, "so long as whatever is before the district
16 court demonstrates that the standard for entry of summary judgment, . . ., is satisfied." *Id*. at 323.

17 If the moving party meets its initial responsibility, the burden then shifts to the opposing
18 party to establish that a genuine issue as to any material fact actually does exist. *See Matsushita*
19 *Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). In attempting to establish the
20 existence of this factual dispute, the opposing party may not rely upon the allegations or denials
21 of its pleadings but is required to tender evidence of specific facts in the form of affidavits, and/or
22 admissible discovery material, in support of its contention that the dispute exists. *See* FED. R.
23 CIV. P. 56(c)(1); *Matsushita*, 475 U.S. at 586 n.11. The opposing party must demonstrate that the
24 fact in contention is material, i.e., a fact that might affect the outcome of the suit under the
25 governing law, *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *T.W. Elec. Serv.,*
26 *Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987), and that the dispute is
27 genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmoving
28 party, *see Wool v. Tandem Computers, Inc.*, 818 F.2d 1433, 1436 (9th Cir. 1987).

In the endeavor to establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor. It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *T.W. Elec. Serv.*, 809 F.2d at 631. Thus, the "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'" *Matsushita*, 475 U.S. at 587 (citations omitted).

"In evaluating the evidence to determine whether there is a genuine issue of fact," the court draws "all reasonable inferences supported by the evidence in favor of the non-moving party." *Walls v. Central Costa County Transit Authority*, 653 F.3d 963, 966 (9th Cir. 2011). It is the opposing party's obligation to produce a factual predicate from which the inference may be drawn. *See Richards v. Nielsen Freight Lines*, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), *aff'd*, 810 F.2d 898, 902 (9th Cir. 1987). Finally, to demonstrate a genuine issue, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts . . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Matsushita*, 475 U.S. at 587 (citation omitted).

**EVIDENCE ON SUMMARY JUDGMENT**

Defense counsel has submitted the parties' joint statement of undisputed material facts ("JSUMF"). (Doc. No. 90-3.) Plaintiffs' counsel has also submitted a separate statement of disputed facts in opposition to the pending motion. (Doc. No. 92-1.) The parties have also submitted declarations signed under penalty of perjury by their respective counsel indexing evidence to be considered on summary judgment. (Doc. Nos. 90-2 and 922.) As indicated above, with leave of court, plaintiffs filed a supplemental declaration by Veronica Ayon, Madueña's sister and duly appointed *guardian ad litem* for plaintiff N.A.C., after the hearing on the pending motion. (Doc. No. 97.) The evidence submitted by counsel for the pending motion for summary judgment establishes the following.

1. N.A.C. is Madueña's biological daughter. (Doc. No. 92-18.)
2. When N.A.C. was first born, Madueña believed N.A.C. was fathered by another man.

4

1  (Doc. No. 97, at 3.)

2  3. About two months after N.A.C. was born, around September 2010, Madueña traveled to Sacramento to visit N.A.C. to determine if she was his child. (*Id*.) During the visit, Madueña spent $80 to buy N.A.C. two pairs of shoes. (JSUMF 21.)

4. When he returned from Sacramento, Madueña told his parents, siblings, and sister, Veronica Ayon that N.A.C. was indeed his child. (Doc. No. 97, at 3.) He acknowledged that N.A.C. looked just like him and has his eyes and the same smile. (*Id*. at 3–4.)

5. Madueña only visited N.A.C. this one time before he passed away. (JSUMF 20–21.)

6. On October 26, 2012, Officers Collins and Alfano were in a police cruiser when Officer Collins saw a car fail to come to a stop at a stop sign. (Doc. No. 90-2, at 14; JSUMF at 1.)

7. The car was driven by Madueña, with Molina as the passenger in the front seat, and Nicholas Chavez, Robert Ruiz, and Shanele Alvarado as passengers in the back seat. (JSUMF 2.)

8. The officers activated the emergency lights on their police vehicle to initiate a stop, but Madueña did not pull over. (JSUMF 3.)

9. Madueña instead drove west down Highway 198 sometimes reaching speeds of over 100 miles per hour. (JSUMF 4.)

10. Along the way, Officer Roberts joined the chase. (JSUMF 5.)

11. Madueña eventually merged onto Highway 99 for a short distance until he took the Goshen off-ramp. (JSUMF 6.)

12. Once off the highway, the road made a sharp turn where Madueña lost control of the vehicle with the car rolling into an abandoned dirt lot and landing on its roof. (JSUMF 7.)

13. As the car came to a rest on its roof, kicking up dust that made it hard to see, the officers drove up in order of their position while engaged in the chase, during which their positions had switched, with Officer Roberts' car taking the lead, followed by the car with Officers Collins and Alfano. (JSUMF 10.)

14. The car driven by Officer Roberts was closer to Madueña's overturned car than the car

1  occupied by Officers Collins and Alfano, but to the right of a line between the other two.
2  (JSUMF 12.)

3  15. As Officer Alfano got out, he focused on the overturned vehicle and drew his weapon.
4  (JSUMF 13.)

5  16. Officer Alfano testified that when he got out of the car he was in, he heard what he
6  believed to be gunshots from two firearms.  (Doc. No. 90-2, at 22.)

7  17. Officer Alfano then got behind the front passenger side fender of Officer Robert's
8  vehicle, which covered part of his body.  Officer Alfano testified he heard what he
9  believed were more gunshots coming from the overturned car or near it, and saw a flash of
10  light he believed was a muzzle flash coming from where he saw a person who turned out
11  to be Nicholas Chavez.  (JSUMF 15.)

12  18. Officer Alfano testified he fired at this subject because he believed the subject was
13  shooting at him and his partners, although he did not see a weapon.  (Doc. No. 90-2, at
14  27–32.)

15  19. Officer Roberts testified that he shot a subject, who turned out to be Molina, as Molina
16  was crawling out of the overturned car because he heard gunshots coming at him, but
17  Officer Roberts too never saw a gun in Molina's hand or saw a muzzle flash although it
18  was hard to see because dust and debris in the air.  (Doc. No. 92-11, at 3–10.)

19  20. Officer Collins testified that he heard two to three gunshots, thought he was being shot at,
20  and fired at a running subject who had just turned towards him.  Officer Collins also did
21  not see anything in the subject's hands and did not see any muzzle flash.  (Doc. No. 92-12,
22  at 3–8.)

23  21. Conversely, Nicholas Chavez and Shanele Alvarado, passengers in the car driven by
24  Madueña, testified that the officers were never fired at by any of the occupants of the
25  crashed vehicle.  (Doc. Nos. 92-3, at 5 and 92-5, at 3.)

26  22. The Physical Evidence Examination Report, prepared by Nancy McCombs of the
27  California Department of Justice Bureau of Forensic Services, reflects that all of the used
28  bullet cartridge casings collected at the scene of the shooting and booked into evidence

1     belonged to the guns fired by Officers Collin, Roberts, and Alfano. (Doc. No. 92-7, at

2     2–5.)

3  23. Two handguns, not belonging to the officers, were found at the scene but could not have

4     fired any of the used cartridge casings found at the scene. (*Id*.)

5  24. Gunshot residue testing done on decedents Molina and Madueña found no gunshot

6     residue on their hands. (Doc. Nos. 92-9, at 2 and 92-10, at 2.)

7  25. Gunshot residue found on the passenger side interior of the overturned vehicle may have

8     come from bullets shot at the car. (Doc. No. 92-8, at 38–40.)

9  26. There is no evidence that testing was ever conducted to determine whether the gunshot

10     residue found on the passenger side interior of the overturned vehicle came from bullets

11     shot at the car or from the car.

12  27. Madueña, Molina, and Chavez were all hit by gunfire as a result of the shootout.

13     Madueña and Molina died. (Doc. Nos. 92-3; 92-14; and 92-15.)

14  28. Officer Alfano shot Chavez, but he did not shoot Madueña or Molina. (JSUMF 9 and

15     16.)

16  29. Chavez's claims against Alfano have been settled and he is a not a party in this action.

17     (JSUMF 18.)

18  30. The boyfriend of N.A.C.'s mother participates in raising and supporting N.A.C. (JSUMF

19     22.)

20  31. Madueña's mother babysits N.A.C. about twice a month and occasionally N.A.C. has

21     weekend visits with Madueña's family. (Doc. No. 97, at 4.)

**ANALYSIS**

*A. Section 1983 claims relating to the high speed chase.*

Defendants seek summary judgment in their favor on all of plaintiffs' § 1983 claims relating to the high speed chase. (Doc. No. 90-1, at 2.) In opposition, plaintiffs respond: "Plaintiffs 42 U.S.C. 1983 claims are based on the contention that the officers used deadly and excessive force against Ruben Molina and Edwardo Madueña and not because of the manner in which the vehicle pursuit was conducted." (Doc. No. 93, at 2.) Plaintiff reiterated this position

during oral arguments.  Accordingly, since plaintiff is not proceeding in this action on any claim relating to the high speed chase itself, defendants' motion for summary judgment on this grounds will be denied as having been rendered moot.

### B.  Defendant Officer Alfano

Defendants Officer Alfano seeks summary judgment on the remaining plaintiffs' § 1983 claim against him on the ground that the undisputed evidence establishes that he did not shoot either Madueña or Molina.  (Doc. No. 90-1, at 7–9.)  It is, in fact, undisputed that Officer Alfano shot only Chavez.  As noted above, Chavez has settled his claims against Officer Alfano and Chavez is no longer a party to this action.

The Civil Rights Act under which this claim was filed provides as follows:

> Every person who, under color of [state law] . . . subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution . . . shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

42 U.S.C. § 1983.  The statute requires that there be an actual connection or link between the actions of the defendants and the deprivation alleged to have been suffered by plaintiff.  *See Monell v. Department of Social Servs.*, 436 U.S. 658 (1978); *Rizzo v. Goode*, 423 U.S. 362 (1976).  "A person 'subjects' another to the deprivation of a constitutional right, within the meaning of § 1983, if he does an affirmative act, participates in another's affirmative acts or omits to perform an act which he is legally required to do that causes the deprivation of which complaint is made."  *Johnson v. Duffy*, 588 F.2d 740, 743 (9th Cir. 1978).

"The requisite causal connection can be established not only by some kind of direct personal participation in the deprivation, but also by setting in motion a series of acts by others which the actor knows or reasonably should know would cause others to inflict the constitutional injury."  *Id.* at 743–44.  *See also Tatum v. Moody*, 768 F.3d 806, 817 (9th Cir. 2014); *Newsome v. Watson*, Civil Action No. 2:14cv94, 2014 WL 4202480, at *5-6 (E.D. Va. Aug. 22, 2014) (denying a motion to dismiss in part because plaintiff had adequately alleged that one officer unreasonably placed himself in a position which would cause his fellow officer to fire resulting in the death of the decedent).  Likewise, liability can be based upon a defendant's "integral

8

participation." *Boyd v. Benton County*, 374 F.3d 773, 780 (9th Cir. 2004). "'[I]ntegral participation' does not require that each officer's actions themselves rise to the level of a constitutional violation." *Id*. at 780. See also *Hopkins v. Bonvicino*, 573 F.3d 752, 770 (9th Cir. 2009). Rather, this doctrine requires "some fundamental involvement in the conduct that allegedly caused the violation." *Blankenhorn v. City of Orange*, 485 F.3d 463, 481 n.12 (9th Cir. 2007). Thus, under this theory, liability does not attach to "a mere bystander" who had "no role in the unlawful conduct." *Chuman v. Wright*, 76 F.3d 292, 294–95 (9th Cir. 1996). *See also Bravo v. City of Santa Maria,* 665 F.3d 1076, 1090 (9th Cir. 2011)*; Jones v. Williams*, 297 F.3d 930, 936 (9th Cir. 2002) (officers are not integral participants simply by the virtue of being present at the scene of an alleged unlawful act).

For example, in *James ex rel. James v. Sadler*, 909 F.2d 834 (5th Cir. 1990), cited with approval by the Ninth Circuit in both the *Chuman* and *Boyd* decisions, the court held that officers who provided armed backup during an unconstitutional search were "integral" to that search, and were therefore participants rather than mere bystanders. *Id*. at 837. Additionally, in *Melear v. Spears*, 862 F.2d 1177 (5th Cir. 1989), also cited with approval by *Chuman* and *Boyd*, the court held that an officer who does not enter an apartment, but stands at the door, armed with his gun, while other officers conduct the search, can nevertheless be found to be a "full, active participant" in the search. *See id.* at 1186.

Ultimately, in *Boyd*, the Ninth Circuit concluded that the facts of the case "clearly support[ed] a finding that each officer involved in the search operation was an 'integral participant'" in the search in question. 374 F.3d at 781. Specifically relevant to the court were the following facts:

> First, as in *James* and *Melear*, the officers in this case stood armed behind Ellison while he reached into the doorway and deployed the flash-bang. Second, the use of the flash-bang was part of the search operation in which every officer participated in some meaningful way. Third, every officer was aware of the decision to use the flash-bang, did not object to it, and participated in the search operation knowing the flash-bang was to be deployed. Therefore, under the integral participation analysis adopted in *Chuman*, each defendant may be held liable for the Fourth Amendment violation . . .

9

*Id. See also Bravo,* 665 F.3d at 1090 (and cases cited therein); *Mitchell v. City of Pittsburg*, No. C 09-00794 SI, 2012 WL 3313178, at *23 (N.D. Cal. Aug. 13, 2012).

As indicated above, here it is undisputed that Officer Alfano did not shoot either Madueña or Molina. However, officers Roberts, Collins, and Alfano have all essentially testified that they fired their guns because each of them heard gunfire and thought they were being shot at. Conversely, plaintiffs have presented evidence that strongly suggests that only the police officers fired their weapons at the scene. Indeed, it is also undisputed that the used bullet cartridge casings collected at the scene and booked into evidence all belonged to the guns fired by Officers Collin, Roberts, and Alfano. The evidence on summary judgment establishes the two handguns that were found at the scene and did not belong to the officers, could not have fired any of the used cartridge casings found at the scene. Moreover, gunshot residue testing done on decedents Molina and Madueña found no gunshot residue on their hands. Gunshot residue found on the passenger side interior of the overturned vehicle may have come from bullets shot at the car or from inside the car, but according to the evidence on summary judgment was never conducted to make the determination of which was the case. Finally, Madueña's passengers Nicholas Chavez and Shanele Alvarado testified that the officers were never fired at by any of the occupants of Madueña's crashed vehicle. Defendants rely on testimony that the sounds produced by the gunfire as reflected in the police video of the incident indicate that first gunshots came from the occupants of the overturned car. Defendants, however, have presented no physical evidence from the scene in moving for summary judgment to support this theory.

Based upon the evidence before the court on summary judgment a reasonable finder of fact could conclude that one of the three officers fired first without legitimate reason for doing so. Moreover, if the finder of fact drew that conclusion it could also reasonably conclude that the officer who fired first should have known this would create a volatile situation which, in fact, directly lead to the other two officers firing at the car and its occupants as well. The evidence on summary judgment reflects that Officer Roberts' vehicle was closest to the overturned car, but was not directly in a line between Officer Collins and Alfano's vehicle and the overturned car. Accordingly, the court finds there is a genuine dispute of material fact as to who fired first. If a

reasonable jury were to find from the evidence that it was Officer Alfano who did so, he could be held liable for "setting in motion a series of acts by others which the actor knows or reasonably should know would cause others to inflict the constitutional injury." *Johnson*, 588 F.2d at 743–44.  Accordingly, summary judgment on plaintiffs' § 1983 claim against Officer Alfano will be denied.[1]

Defendants also seek summary judgment in their favor with respect to plaintiffs' state law claims for battery and wrongful death on the grounds that those claims are coextensive with plaintiffs' § 1983 claims.  (Doc. No. 90-1, at 10.)  Since defendants motion for partial summary judgment on plaintiffs' § 1983 claims is being denied for the reasons set forth above, defendants motion for summary judgment on plaintiffs' state law claims for battery and wrongful death will be denied as well.

*C.  Plaintiff N.A.C.*

Defendants' seek summary judgment in their favor on all claims brought by plaintiff N.A.C. on the grounds that Madueña never held N.A.C. out as his child.  (Doc. No. 90-1, at 10–11.)  The laws of intestate succession form the basis of plaintiffs' authority to bring a cause of action for the death of another in California.  CAL. CODE CIV. PROC. § 377.60; *Cheyanna M. v. A.C. Nielson Co.*, 66 Cal. App. 4th 855, 861 (1998).  In relevant part:

> Paternity is established by clear and convincing evidence that the father has openly held out the child as his own.

CAL. PROB. CODE § 6453(b)(2).  "[S]ection 6453(b)(2) requires an affirmative representation of paternity that is unconcealed and made in open view.  Although the representation must be a public one, in the sense of being made in open view, the statute does not require an announcement to the world, an official action, or an affectionate fatherly intent." *Estate of Britel*, 236 Cal. App. 4th 127, 139 (2015), *as modified on denial of reh'g* (May 15, 2015), *review denied* (July 29, 2015).  In *Britel*, the alleged father acknowledged paternity in a private email to the child's mother, but never told his family about the pregnancy or the child nor acknowledged

---

[1] In light of this conclusion, plaintiffs' request for additional discovery in order to oppose defendants' motion is rendered moot.

11

paternity in any other way. *Id*. at 144. The court found that that the private email to the mother did not constitute openly holding the child out as his own. *Id*. at 144–45. The also court noted that the decision in *Estate of Baird*, 193 Cal. 225, 277 (1924) provided instructive guidelines for making this determination:

> "While it is not required in order to constitute public acknowledgment that the father declare his paternity under all circumstances, it would be opposed to the idea of public acknowledgment if he deliberately refrained from declaring his paternity when the occasion would naturally demand it; or misrepresented the fact, or remained silent when he would reasonably be expected to announce he was the father of the child, as, for instance, in the case of immediate relatives." [*Baird*, 193 Cal. at 276] Nor does a person publicly acknowledge a child by revealing the child's existence to persons who are not "likely to make public what [the decedent] had said to them on such a subject, but rather to accept it as a matter of confidence, to be kept secret." [*Id*. at 275.]

*Britel*, 236 Cal. App. 4th at 139–140.

The parties here dispute whether or not Madueña held N.A.C. out to be his child during his life. While Madueña had only a single visit with N.A.C., plaintiffs' have filed a supplemental affidavit representing that Madueña did state to his family that N.A.C. was his child.[2] (See Doc. No. 97.) Thus, unlike the case in *Britel*, Madueña did not "remain[] silent when he would reasonably be expected to announce he was the father of the child, as, for instance, in the case of immediate relatives." *Baird*, 193 Cal. at 276. Furthermore, the affidavit indicates that Madueña told multiple family members all at one time that N.A.C. was his child, suggesting that the news was not "a matter of confidence, to be kept a secret." This creates a genuine dispute of material fact as to whether paternity can be established in this case. Accordingly, defendants' motion for summary judgment on this issue will also be denied.

/////

/////

---

[2] The court finds that statements allegedly made by Madueña set forth in the affidavit submitted by plaintiffs are not hearsay. These statements are not being offered to prove the truth of the matter asserted as they are not being offered to prove that N.A.C. was Madueña's daughter, but rather to show that Madueña held N.A.C. out as his child. *See* FED. R. EVID. 801(c); *Ostad v. Oregon Health Scis. Univ.*, 327 F.3d 876, 886 (9th Cir. 2003).

**CONCLUSION**

For the reasons set forth above, defendant's motion for partial summary judgment (Doc. No. 90) is denied.

IT IS SO ORDERED.

Dated: __**June 22, 2016**__   _____
UNITED STATES DISTRICT JUDGE